UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 24-20295-CR-BECERRA

UNITED STATES OF AMERICA,

    Plaintiff,
v.

**BRAYAN TOCHON-LOPEZ**,
WILMER MOISES BARSELO,
JOSE FELICIANO LEMOS,
JESUS RODRIGUEZ,
LUIS ANDRES ZUNIAGA,
JORGE LUIS LOPEZ-ASTUDILLO,
EULIDES OLIVEROS-LUGO, and
STIVEN JOSE FLORES,

    Defendants.
_____/

## JOINT MOTION TO DISMISS INDICTMENT

The indictment charges Mr. Brayan Tochon-Lopez and his co-defendants—all Venezuelan nationals found on a vessel that had departed from Venezuela and was stopped less than 17 nautical miles from Venezuela's coast—with violations of the Maritime Drug Law Enforcement Act ("MDLEA"), 46 U.S.C. §§ 70501-70508. He now respectfully moves this Court, through counsel, to dismiss the indictment for lack of subject matter jurisdiction, pursuant to Fed. R. Crim. P. 12(b)(2). All of his co-defendants join in the motion: Wilmer Moises Barselo (represented by Marc Seitles), Jose Feliciano Lemos (by David Donet, Jr.), Jesus Rodriguez (by Roger Cabrera), Luis Andres Zuniaga (by Joseph Chambrot), Jorge Luis Lopez (by Frank Quintero), Eulides Oliveros-Lugo (by Jose Batista), and Stiven Jose Flores (by Dianne Caramés).

1

There are three grounds on which the indictment should be dismissed. *First*, the offense here occurred in waters that are part of Venezuela's 24-nautical-mile "contiguous zone" and not on the "high seas," as is required by the U.S. Constitution's Felonies Clause. The MDLEA is thus unconstitutional as applied in this particular case. *Second*, for related reasons, the MDLEA's definition of a stateless vessel is void for vagueness to the extent that it is applied to conduct occurring in another nation's contiguous zone. *Third*, for purposes of further review, Congress's Felonies Clause power does not extend to felonies bearing no ties to the United States, and this Court's exercise of *in personam* jurisdiction over Mr. Tochon violates the Due Process Clause.

## BACKGROUND

This case arises out of a June 26, 2024, maritime interdiction and arrest by the U.S. Coast Guard in waters less than 17 nautical miles from the coast of Venezuela.

### *Relevant Maritime Zones*

**The 12 nm territorial waters.** Under today's customary international law, "[e]very State has the right to establish the breadth of its territorial sea up to a limit not exceeding 12 nautical miles" ("12 nm") from its coastal baseline. United Nations Convention on the Law of the Sea ("UNCLOS"), *opened for signature* Dec. 10, 1982, 1833 U.N.T.S. 397 (entered into force Nov. 16, 1994), art. 3; *see United States v. Alfonso*, 104 F.4th 815, 821 n.6 (11th Cir. 2024) (explaining that the United States "generally recognizes the Convention as customary international law"). In the territorial sea, states enjoy a limited sovereignty "subject to this Convention and to other rules of international law." 1833 U.N.T.S. 397, art. 2.

**The 24 nm contiguous zone.** UNCLOS also provides for "a zone contiguous to [the] territorial sea," which "may not extend beyond 24 nautical miles from the baselines" and in which coastal states "may exercise the control necessary to:

(a) prevent infringement of its customs, fiscal, immigration or sanitary laws and regulations within its territory or territorial sea;

(b) punish infringement of the above laws and regulations committed within its territory or territorial sea."

1833 U.N.T.S. 397, art. 33.

**The 200 nm Exclusive Economic Zone ("EEZ").** UNCLOS finally provides that the "exclusive economic zone shall not extend beyond 200 nautical miles from the baselines from which the breadth of the territorial sea is measured." *Id.*, art. 57. Within the EEZ, coastal nations enjoy "sovereign rights for the purpose of exploring and exploiting, conserving and managing the natural resources." *Id.*, art. 56.

**The U.S. and Venezuela.** The United States has declared all three of these internationally recognized maritime zones up to the limits authorized by UNCLOS. Presidential Proclamation No. 5928, 54 Fed. Reg. 777 (Dec. 27, 1988) (establishing a 12-nm territorial sea); Presidential Proclamation No. 7219, 64 Fed. Reg. 48701 (Sept. 2, 1999) (establishing a 24-nm contiguous zone); Presidential Proclamation No. 5030, 48 Fed. Reg. 10605 (Mar. 10, 1983) (establishing a 200-nm EEZ). Venezuela has done the same. Decree No. 1446 of Nov. 17, 2014, Aquatic Areas Organic Act, arts. 8, 43-46, Special Official Gazette No. 6153 (Nov. 18, 2014) (Venez.), *available at* https://www.un.org/Depts/los/LEGISLATIONANDTREATIES/PDFFILES/Venezuela_ENG.pdf.

*Interdiction, Arrest, and MDLEA Charges*

On the morning of June 26, 2024, at 827 Zulu (4:27 AM Venezuelan), a Dutch naval ship working with the U.S. Coast Guard was informed of a "possible target of interest." Exh. 1, at 1. This vessel reportedly had eight persons on board. *Id.* It was inside Venezuelan territorial waters. *Id.* And it was travelling at 160T, indicating a southeast direction of travel (the notation format is equivalent to degrees in a circle, so 00T is due North and 180T is due South). *Id.* Twenty minutes later, officers saw a second vessel located about 10 nm from the first. *Id.* at 3-4. This vessel was reported to have three persons on board. *Id.* at 4. It too was travelling southeast, at 106T. *Id.*

The Coast Guard decided to pursue the second vessel and then monitored it for some time as it traveled southeast and east, at times within Venezuelan territorial waters. *Id.* For instance, at 910 Zulu, the vessel was at 11-06.36N/068-05.29W (also written as 11.110000, -68.091389), traveling at 120T. *See id.* As is shown below, it



4

appears the second vessel was, at this point, just inside the territorial waters of Venezuela and moving along the coast.[1]

At 955 Zulu, the Coast Guard received authorization to interdict the second vessel. Exh. 1, at 4. The vessel was located within Venezuela's 24-nm contiguous zone. *Id.* At the specific time of interdiction, it was located less than 17 nautical miles from the coast (less than 5 nautical miles from Venezuela's territorial waters). *Id.* at 4-5.

While monitoring the vessel, Coast Guard officers had observed that the vessel had a name (El-Gran-Titito CPNO) and registration number (ADSS 7989) painted on it. *Id.* After interdiction, officers boarded the vessel, and a translator asked boarding questions in Spanish. No one claimed to be master or person in charge, and no claim of nationality was made for the vessel. However, officers learned that the vessel had departed from a port in Venezuela, and that all eight persons on board were Venezuelan nationals. *Id.* at 3. There is no indication any follow-up information was gathered about the vessel's name or registration. There is certainly no allegation or indication in the discovery that the vessel, the persons on board, the route, or any other facts bear any connection to the United States.

The defendants were detained and brought to the Southern District of Florida on July 6, 2024, and they had initial appearances on July 8, 2024. DE 3-8, 11-12. On July 12, 2024, an indictment was returned charging them with drug crimes under the MDLEA, in violation of 46 U.S.C. §§ 70506(b) and 70503(a)(1). DE 14.

---

[1] Image generated through the coordinates-based search function at Marineregions.org (*last visited* Feb. 11, 2025).

## ARGUMENT

**I.     Because the alleged offense here occurred in Venezuela's contiguous zone, not the "high Seas," the MDLEA is unconstitutional as applied.**

The Constitution's "Define and Punish Clause" contains three distinct grants of power: (i) "the power to define and punish piracies," ("Piracies Clause") (ii) "to define and punish felonies committed on the high seas," ("Felonies Clause"), and (iii) "to define and punish offenses against the law of nations" ("Offences Clause"). *United States v. Bellaizac-Hurtado*, 700 F.3d 1245, 1248 (11th Cir. 2012); U.S. CONST., art. I, sec. 8, cl. 10. As is now well-established, Congress's authority to enact the relevant portions of the MDLEA—including its jurisdictional provisions—arises solely under its Felonies Clause power. *See Bellaizac-Hurtado*, 700 F.3d at 1248 (holding there is no power to enact the MDLEA under the Offences Clause); *United States v. Davila-Mendoza*, 972 F.3d 1264, 1267 (11th Cir. 2020) (holding there is no power to enact the MDLEA under the Foreign Commerce Clause and rejecting that the statute is a necessary and proper exercise of the Treaty power). Thus, by the Felonies Clause's plain text, the MDLEA is only constitutional when applied to conduct ***on the high seas***. *See Bellaizac-Hurtado*, 700 F.3d at 1247-48 (finding MDLEA unconstitutional as applied to offense that occurred in territorial waters of another nation *even where that nation consented to U.S. jurisdiction*); *Davila-Mendoza*, 972 F.3d at 1267 (same).

This limitation has led to much recent litigation, and last year, the Eleventh Circuit issued a key decision holding that the 200-nm EEZ of another nation *is* in fact part of the "high Seas," for purposes of the Felonies Clause. *United States v. Alfonso*, 104 F.4th 815, 821 (2024), *petition for cert. filed*, case no. 24-6177 (U.S. Dec. 17, 2024).

As a preliminary matter, Mr. Tochon maintains, for purposes of further review, that the EEZ is *not* part of the "high Seas" because the overall scope of the Felonies Clause—including the term "high Seas"—is limited by customary international law, and customary international law is clear that a nation's EEZ *is not* part of the high seas. **<u>But separately</u>**, Mr. Tochon submits that even if the broader EEZ is part of the high seas, under *Alfonso*, the **<u>contiguous zone is not part of the high seas</u>** within the meaning of the Felonies Clause, and application of the MDLEA is thus unconstitutional on the unusual facts of this particular case.

*First*, it should be noted that neither the *Alfonso* briefs nor the opinion addressed the contiguous zone; the issue simply did not arise. This issue is thus new.

*Second*, as to the question that did arise in *Alfonso*, the Eleventh Circuit ruled that "the scope of Congress's authority under the Felonies Clause (i.e., whether Congress can define and punish conduct that occurs in an EEZ) is informed by the meaning of 'high seas' when the Framers ratified and adopted the Constitution." *Alfonso*, 104 F.4th at 821. The Court relied on the fact that there was no concept of the EEZ at the founding, and that "[n]othing about the modern EEZ as defined by customary international law disturbs in any way the Founding era concept of the term 'high seas' that informed the original meaning of the Felonies Clause." *Id.* The Court focused on the fact that the EEZ was created for economic rights. *Id.* at 823.

*Third*, the *Alfonso* Court noted that by contrast, there *was a concept* of the "territorial sea" in the founding era. *Id.* at 822. The Court first observed that *before* the founding, "the sea was largely viewed as common property subject to unilateral

7

appropriation by any nation," and that as a result, "nations made wide and conflicting claims of sovereignty over the seas." *Id.* at 821-822. But by the time of the founding, although the exact boundary was still "up for debate," there was a "concept that a nation could exercise sovereignty over waters" within a range that was generally defined by "the cannon shot rule," which signified one to three nautical miles from the shore. *Id.* at 822 (citing *United States v. Alarcon Sanchez*, 972 F.3d 156, 170 (2d Cir. 2020) ("At the founding, the United States's territorial waters extended 'roughly three miles.'")); *see also id.* (citing Thomas Jefferson, Letter to Certain Foreign Ministers in the United States (Nov. 8, 1793) (stating that in considering what distance from our shores "the territorial protection of the United States shall be exercised," President Washington had "provisionally" ordered his officers "to consider…for the present…the distance of one sea-league or three geographical miles from the sea shores," which Jefferson equated with "the utmost range of a cannon ball")). The fact that a nation could exercise a degree of sovereignty in its territorial sea served to exclude that area from the "high seas." *Id.* (noting, by contrast, that "the 'high seas' were not subject to the sovereignty of any nation").

*Fourth*, importantly, *Alfonso* acknowledged that "the concept of territorial sea under international law has continued to evolve with time" and accepted that the geographical limits were "officially extended…from three to twelve nautical miles by means of a presidential proclamation to conform with current international law." *Id.* at 822 n.9. Thus, the Court relied on founding era history, as informed by subsequent changes made to conform with international law, to find that today, the 12-nautical-

8

mile territorial waters are excluded from the "high seas" under the Felonies Clause.

*Fifth*, for the very same reasons—founding era history informed by subsequent changes in international law—the 24-nautical-mile contiguous zone should also be excluded from the "high seas" for purposes of the Felonies Clause. To begin, as with the territorial sea, the concept of the contiguous zone *did* exist when the Framers ratified the Constitution, and the concept in fact grew up together with that of the territorial sea. At the founding, the waters of the "contiguous zone" extended twelve nautical miles from the coast, and were known as "customs waters"—these two terms have in fact been used interchangeably in U.S. law since then. *U.S. Maritime Limits & Boundaries: History of Maritime Zones Under International Law*, NAT'L OCEANIC AND ATMOSPHERIC ADMIN. | DEP'T OF COMMERCE ("*NOAA on Maritime History*") (*last visited* Feb. 5, 2025), *available at* https://nauticalcharts.noaa.gov/data/us-maritime-limits-and-boundaries.html (explaining that the 12 nm "zone was known as 'customs waters' and was later called the 'Contiguous Zone.'"); *see also* S. 71, 118th Cong. (2023) (seeking to extend the legal definition of "customs waters" from 12 to 24 nm, consistent with the presidential proclamation so extending the contiguous zone).

Both the territorial sea and the customs waters emerged in the late 1700s "in response to issues of national security and law enforcement at coastal areas." *NOAA on Maritime History*. And indeed at the founding, the United States had authority to board vessels and engage in various law enforcement functions within a 12-nm zone. *See Maul v. United States*, 274 U.S. 501, 506 (1927) (explaining that "[i]n the early acts the authority to board and search was limited, not only to vessels bound to the

9

United States, but to such as were within the territorial waters of the United States or within 4 leagues (12 miles) of the coast."). Indeed, the very First Congress of the United States, sitting in its first session in 1789, granted customs officials "full power and authority, to enter any ship or vessel, in which they shall have reason to suspect any goods, wares or merchandise subject to duty shall be concealed; and therein to search for, seize, and secure any such goods, wares or merchandise." Act of July 31, 1789, ch. 5, s. 24, 1 Stat. 29 (1789). This customs power to stop, enter, and search vessels was deemed "plenary." *United States v. Ramsey*, 431 U.S. 606, 616 (1977). And the next year, the First Congress enacted a law that introduced the four-league (or 12-mile) limit for the zone in which customs authority could be enforced, specifically giving the U.S. broad law enforcement authority in that area:

> That it shall be lawful for all collectors, naval officers, surveyors, inspectors, and the officers of the revenue cutters . . . to go on board of ships or vessels in any part of the United States, or within four leagues of the coast thereof, if bound to the United States, whether in or out of their respective districts, for the purposes of demanding the manifests aforesaid, and of examining and searching the said ships or vessels; and the said officers respectively shall have free access to the cabin, and every other part of a ship or vessel.

Act of Aug. 4, 1790, ch. 35, s. 31, 1 Stat. 164 (1790).[2]

This twelve-mile-limit persisted for hundreds of years and consistent with that history, <u>unlike the EEZ</u>, both the territorial sea and the "contiguous zone" were recognized by the first international Conference on the Law of the Sea. *See* United

---

[2] As a note, the United States has since further expanded its definition of "customs waters" to include not only the 12-nautical-mile geographical component, but to also include the case of any foreign flag vessel subject to a treaty arrangement between the U.S. and the foreign nation, regardless of where apprehended. 19 U.S.C. § 1401(j).

10

Nations Convention on the Territorial Sea and Contiguous Zone, *opened for signature* Apr. 29, 1958, 516 U.N.T.S. 205, art. 24 (entered into force Sept. 10, 1964) ("The contiguous zone may not extend beyond twelve miles from the baseline from which the breadth of the territorial sea is measured."); *compare Alfonso*, 104 F.4th at 823 (noting "[t]he first international recognition of the EEZ appears in the 1982 UNCLOS treaty"). And as to both the territorial sea and the contiguous zone, it was only the modern geographical limits—the respective twelve and twenty-four nautical mile limits—that were established in the 1982 UNCLOS. UNCLOS, arts. 3, 33.

To be clear, Mr. Tochon does not contend that the contiguous zone was or today is *part of* the territorial sea—indeed, it is clear the two zones have always been distinct. *See, e.g.*, *United States v. Williams*, 617 F.2d 1063, 1073 n.6 (11th Cir. 1980) (using the term "high seas" to <u>exclude</u> the territorial sea but <u>include</u> the then 12-nm customs waters, and the term "international waters" to exclude both, in resolving a Fourth Amendment case that occurred outside of both zones in international waters). However, the authority of a coastal nation to engage in core sovereign functions—primarily law enforcement—in its customs waters, and the *distinction* between those waters and wider international waters has also consistently been recognized in law since the founding. *See, e.g.*, *United States v. Ceballos*, 706 F.2d 1198, 1200 (11th Cir. 1983) (noting that the "jurisdiction of the Customs Service ***does not generally extend to the high seas***" but is "usually ***limited to customs waters***, which extend approximately twelve miles off the United States coast."). Indeed, unlike with the EEZ, which has always been focused on economic concerns, the very purpose of the

coastal nation's authority in the narrower contiguous zone has always been the core function of law enforcement. *See* Presidential Proclamation No. 7219, 64 Fed. Reg. 48701 (Sept. 2, 1999) (noting that extending "the contiguous zone of the United States to the [24-nm] limits permitted by international law will advance the law enforcement and public health interests of the United States.").

Ultimately, under international law today, even the waters of the wider EEZ are not considered part of the high seas. *See, e.g.*, 33 C.F.R. § 2.32(d) ("Under customary international law as reflected in the 1982 United Nations Convention on the Law of the Sea… high seas means all waters that are not the exclusive economic zone (as defined in § 2.30), territorial sea (as defined in § 2.22), or internal waters of the United States or any other nation."). This issue was raised in *Alfonso* but as was described above, it did not matter as to the wider EEZ because that concept did not exist at all in the founding era. *Alfonso*, 104 F.4th at 821-822. However, given that the contiguous zone—or "customs waters"—*did exist* at the founding, and given that the core authority in that zone always concerned law enforcement, this Court should rule that the contiguous zone *is not* part of the high seas under the Felonies Clause.

## II. The MDLEA's extraterritoriality and jurisdictional provisions are void for vagueness either on their face, or as applied in the contiguous zone.

Even if the Court finds that Congress does have the authority, under the Felonies Clause, to regulate conduct occurring within another nation's contiguous zone, the MDLEA is unconstitutionally vague in this regard. As a result, due process requires the Court to find that 46 U.S.C. §§ 70502(c)(1)(A) and 70503(b) are void, either on their face or as applied in the contiguous zone of another nation.

12

The Fifth Amendment of the U.S. Constitution provides that "[n]o person shall…be deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V. The Supreme Court has long recognized that "the Government violates this guarantee by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015) (holding that imposing increased sentences under the ACCA's residual clause violated the Fifth Amendment's due process guarantee because the provision was unconstitutionally vague). The prohibition on vagueness in criminal statutes "is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law," and a statute that flouts it "violates the first essential of due process." *Id.* Critically, the doctrine "guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries, and judges." *Sessions v. Dimaya*, 584 U.S. 148, 156 (2018) (voiding the residual clause definition of "crime of violence" for vagueness). The doctrine thus also memorializes separation of powers, because if "the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, [it would] substitute the judicial for the legislative department." *Id.*

The MDLEA prohibits drug crimes on a "covered vessel," and the statute's extraterritoriality clause specifies that this prohibition "applies even though the act is committed outside the territorial jurisdiction of the United States." 46 U.S.C. §§

13

70503(a) and (b). A "covered vessel," in relevant part, is defined to include a "vessel without nationality" (also called a "stateless vessel"). § 70502(c)(1)(A). And a stateless vessel includes, as is relevant here, "a vessel aboard which the master or individual in charge fails, on request of an officer of the United States authorized to enforce applicable provisions of United States law, to make a claim of nationality or registry for that vessel." § 70502(d)(1)(B). But none of these provisions set forth <u>any standards</u> for how, if at all, U.S. authorities may establish U.S. jurisdiction in the contiguous zone of another nation, where, as described above, the coastal nation unquestionably has a recognized right to assert jurisdiction and enforce its own domestic laws.

The MDLEA's authors were plainly aware of the problems with asserting U.S. jurisdiction in waters where another nation may legitimately enforce its own laws. As to the territorial waters of another nation, for instance, the statute provides that the U.S. may assert its jurisdiction over "a vessel in the territorial waters of a foreign nation *if the nation consents to the enforcement of United States law by the United States.*" 46 U.S.C. § 70502(c)(1)(E) (emphasis added). The Eleventh Circuit has, of course, invalidated application of this provision for exceeding Congress's Felonies Clause authority. *See Davila Mendoza*, 972 F.3d at 1267. But the provision nonetheless highlights the relative *standardlessness* in the MDLEA as to how U.S. authorities are to navigate a similar conflict involving, for instance, Venezuelan authorities legitimately enforcing Venezuelan law in Venezuela's contiguous zone.

Specifically, where U.S. authorities encounter a vessel like the one in this case, which is without question subject to Venezuelan law and jurisdiction in that nation's

14

contiguous zone, is the Coast Guard required to ask Venezuela before asserting U.S. jurisdiction and taking the vessel? Alternatively, supposing the Coast Guard were to be faced with a competing claim of jurisdiction from Venezuelan law enforcement at the time of interdiction—again, one that is unquestionably recognized by both the United States and the international community—does Congress expect the U.S. Coast Guard to yield? Could the Coast Guard take the position that it is authorized under the MDLEA to assert jurisdiction, and refuse Venezuelan authorities' request? How would the conflict be resolved if Venezuela were to make its claim of jurisdiction now? And finally where, as in this case, there are two similarly situated vessels within a few miles of each other, both in or near territorial waters and then customs waters, could American and Venezuelan law enforcement strike a deal to each take one vessel back to their respective countries to be charged under their domestic laws?

The Supreme Court has explained that "[a]lthough the [void-for-vagueness] doctrine focuses both on actual notice to citizens and arbitrary enforcement…the more important aspect of vagueness doctrine is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement." *Kolender v. Lawson*, 461 U.S. 352, 353-54 (1983) (invalidating a California statute that allowed police to detain those subject to a *Terry* stop unless they provided "credible and reliable" identification) (internal quotations omitted). The *Kolender* Court noted that because the statute at issue in that case contained no standards for what police could accept as "credible and reliable" identification, the statute "vests virtually complete discretion in the

15

hands of the police to determine whether the suspect has satisfied the statute and must be permitted to go on his way." *Id.* at 358. The MDLEA creates the same problem in the contiguous zone. In a contiguous zone where Venezuela undoubtedly has the right to assert jurisdiction to enforce its own laws, the statute contains no standards by which the Coast Guard is to determine whether it is to affirmatively ask for Venezuela's consent, or if that is not required, what to do if Venezuela makes a valid claim of jurisdiction. The effect is that the statute, as drafted, "contains a vague enforcement standard that is susceptible to arbitrary enforcement." *See id.* at 355. Thus, the statute should be held void in this context.

While the Eleventh Circuit has previously addressed vagueness challenges to the MDLEA and its predecessor statutes, none addressed the issue presented here. *See, e.g., United States v. Gruezo*, 66 F.4th 1284, 1292 (11th Cir. 2023) (rejecting vagueness challenge to the statutory requirements for making a claim of nationality); *United States v. Marino-Garcia*, 679 F.2d 1373, 1384 (11th Cir. 1982) (same); *United States v. Mena*, 863 F.2d 1522, 1527 (11th Cir. 1989) (rejecting challenge to the phrase "vessel subject to the jurisdiction of the United States" as "esoteric" or "technical"). This case is meaningfully different—the issue raised is not that the defendants cannot understand the MDLEA, but that law enforcement are not given standards that are necessary to ensure consistent and nonarbitrary enforcement in a remote maritime setting where another country has a valid claim to enforce its own domestic laws. As such, the jurisdictional and extraterritoriality provisions at issue here are unconstitutional either on their face or as applied in the contiguous zone.

16

### III. Congress's power under the Felonies Clause is limited to offenses bearing a nexus to the United States and the exercise of jurisdiction over Mr. Tochon in this case violates due process.

Finally, where, as here, neither Mr. Tochon nor his offense had any prior ties to the United States, the indictment must be dismissed because *first*, Congress's Article I authority under the Felonies Clause does not extend to felonies bearing no ties to the United States; and *second*, this Court's exercise of *in personam* jurisdiction over Mr. Tochon violates the Due Process Clause of the United States Constitution.

*First*, the MDLEA exceeds Congress's Felonies Clause power because that power does not extend to drug trafficking offenses bearing no connection to the United States. *See United States v. Angulo-Hernández*, 576 F.3d 59, 60 (1st Cir. 2009) (Torruella, J., dissenting from the denial of en banc review) ("The term "Felonies" has not been read to include all felonies, but rather only felonies with an adequate jurisdictional nexus to the United States.") (citing *United States v. Furlong*, 18 U.S. (5 Wheat.) 184, 189 (1820)). *See generally also* Eugene Kontorovich, The "Define and Punish" Clause and the Limits of Universal Jurisdiction, 103 Nw. U. L .Rev. 149, 163-4 (Winter 2009) (discussing the history of Art. I, § 8, cl. 10, and arguing that the Felonies Clause is limited to felonies with a nexus to the United States).

Mr. Tochon acknowledges that the Eleventh Circuit has rejected challenges to the MDLEA's constitutionality as applied to unregistered vessels on the high seas. *See, e.g.*, *United States v. Campbell*, 734 F.3d 802, 806 (11th Cir. 2014); *United States v. Cruickshank*, 837 F.3d 1182, 1190 (11th Cir. 2016); *United States v. Estupinan*, 453 F.3d 1336, 1338 n.2 (11th Cir. 2006); *United States v. De La Garza*, 516 F.3d 1266,

17

1272 (11th Cir. 2008); *United States v. Rendon*, 354 F.3d 1320, 1325 (11th Cir. 2003); *United States v. Marino-Garcia*, 679 F.2d 1373, 1383 (11th Cir. 1982). Therefore, if the Court finds that the MLDEA may constitutionally be enforced in another nation's EEZ and even in another nation's contiguous zone, Mr. Tochon maintains this nexus-related argument for purposes of further review.

*Second*, although the Eleventh Circuit has reviewed Due Process challenges to the MDLEA in other contexts, it is believed that the Court has never ruled on the narrow "as applied" challenge presented in this case, which is based on Venezuela's interest in exercising its internationally recognized law enforcement authority in its own contiguous zone. Whatever interest the United States may have in prosecuting drug trafficking cases occurring on the high seas, there is a clear diminishment of the United States' legitimate exercise of authority where another nation has a small, long-standing, and clearly-defined sphere in which it is entitled to enforce its laws.

Indeed, Mr. Tochon respectfully maintains that the Court's exercise of jurisdiction in this case is inconsistent with "traditional notions of fair play and substantial justice." *See International Shoe Co. v. State of Washington*, 326 U.S. 310, 316 (1945) (holding that, in order to subject a defendant to a civil judgment, due process requires that the individual "have certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice'") (internal citation omitted).

Here, neither Mr. Tochon nor any of his seven co-defendants were present in the United States nor any United States territory at the time of the offense. None of

18

them are U.S. nationals; indeed, they are all Venezuelan nationals who were living in that country prior to their arrest. They carried on no business or activity in the United States. There is no evidence that the drugs in the case—which were essentially being transported along the coast of Venezuela—were destined for the United States, or that the offense would have a direct and foreseeable effect within the United States. The exercise of civil jurisdiction under circumstances such as these would clearly violate due process. *See id*. There is no reason why the Due Process Clause should have any less force in limiting the criminal jurisdiction of United States courts. *See also United States v. Zakharov*, 468 F.3d 1171, 1177 (9th Cir. 2006) (internal quotation omitted) (holding, in cases involving registered vessels, that due process requires a "nexus between the United States and the defendant's activities," that is analogous to the "minimum contacts" required for personal jurisdiction.). Thus, the exercise of jurisdiction over Mr. Tochon is not consistent with due process

*    *    *

Wherefore, Mr. Tochon, joined by his co-defendants, respectfully submits that the MDLEA is unconstitutional in this case, and the indictment must be dismissed.

Respectfully Submitted,

HECTOR DOPICO
INTERIM FEDERAL PUBLIC DEFENDER

BY:  *s/Srilekha Jayanthi*
Assistant Federal Public Defender
Special  Bar No. A5502728
150 W. Flagler Street, Suite 1700
Miami, Florida 33130-1556
(305) 530-7000/ (305) 536-4559, Fax
E-Mail:  srilekha_jayanthi@fd.org

19

## CERTIFICATE OF SERVICE

I HEREBY certify that on **February 12, 2025**, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*s/ Srilekha Jayanthi*