## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 24-20295-CR-BECERRA/TORRES

UNITED STATES OF AMERICA,

     *Plaintiff,*

vs.

BRAYAN TOCHON-LOPEZ,
WILMER MOISES BARSELO,
JOSE FELICIANO LEMOS,
JESUS RODRIGUEZ,
LUIS ANDRES ZUNIAGA,
JORGE LUIS LOPEZ-ASTUDILLO,
EULIDES OLIVEROS-LUGO, and
STIVEN JOSE FLORES,

     *Defendants.*

_____/

## REPORT AND RECOMMENDATION ON DEFENDANTS' JOINT MOTION TO DISMISS INDICTMENT

This matter is before the Court on Defendants Brayan Tochon-Lopez, Wilmer Moises Barselo, Jose Feliciano Lemos, Jesus Rodriguez, Luis Andres Zuniaga, Jorge Luis Lopez-Astudillo, Eulides Oliveros-Lugo, and Stiven Jose Flores' (collectively "Defendants"), Joint Motion to Dismiss Indictment. [D.E. 71]. The Unites States of America (the "Government") filed a Response in Opposition on February 26, 2025 [D.E. 77], to which Defendants replied jointly on March 5, 2025. [D.E. 82]. Therefore, the Motion is now ripe for disposition.[1] After careful consideration of the Motion, the

_____

[1] On February 25, 2025, the Honorable Jacqueline Becerra referred the Defendants' motion to the undersigned Magistrate Judge for disposition. [D.E. 76].

record, the relevant authorities, and for the reasons discussed below, Defendants'
Motion should be **DENIED**.

## I.   BACKGROUND

According to the Government, on or about June 26, 2024, a maritime patrol
craft detected a Go-Fast Vessel ("GFV") approximately 20 nautical miles East of
Tucacas, Venezuela.  [D.E. 77 at 2].  Eight individuals were on the GFV, which itself
had several of outboard engines, no apparent nationality, and bales—later discovered
to be eight bales, field tested positive for cocaine—visible onboard.  *Id.* at 2–3.

Suspecting the GFV and its crew were involved in drug smuggling, the HNLMS
GRONINGEN (the "GRONINGEN")—in the area with a United States Coast Guard
District 7 ("D7") Law Enforcement Detachment Team ("LEDET") on board—diverted
to interdict the vehicle and investigate.  *Id.* at 2.  The LEDET team, having assumed
tactical control, granted a Statement of No Objection for a Right of Visit Boarding to
stop the then-noncompliant GFV, complete with authorization to employ both
warning shots and disabling fire.  *Id.*

The GRONINGEN launched two FRISCs in the water, along with a Helicopter
Interdiction Tactical Squadron ("HITS").  *Id.*  The HITS employed warning fire.  *Id.*
When that was ineffective, the HITS employed disabling fire.  *Id.*  It was during this
pursuit that the crew on the FRISCs witnessed the individuals on the GFV throwing
overboard some of the bales earlier observed.  *Id.*  Once the FRISCs made it to the
incapacitated vessel, the law enforcement team gained control of the GFV and its
crew.  *Id.*

Upon being questioned, Mr. Tochon-Lopez identified himself as the master[2], but did not claim any nationality for the vessel. *Id.* The GFV was then treated as without nationality and therefore subject to the jurisdiction of the United States. *Id.* The law enforcement team recovered bales from the boat and water, which field tested positive for cocaine. *Id.* at 3. All eight passengers, the Defendants here, were taken into custody. *Id.*

The Defendants were charged by indictment on July 11, 2024, in the Southern District of Florida. [D.E. 14]. Defendants now move to dismiss the indictment, arguing issues of due process, vagueness, and unconstitutionality regarding the Maritime Drug Law Enforcement Act ("MDLEA"), 46 U.S.C. §§ 70501–508.

## II.    APPLICABLE PRINCIPLES AND LAW

### A.    *Motions to dismiss an indictment*

A motion to dismiss an indictment is governed by Federal Rule of Criminal Procedure 12(b), which allows a defendant to challenge an indictment on various grounds, including failure to state an offense, lack of jurisdiction, or constitutional reasons. *See United States v. Kaley*, 677 F.3d 1316, 1325 (11th Cir. 2012). Moreover, a "motion that the court lacks jurisdiction may be made at any time while the case is pending," including after guilty pleas have been entered. *See* Fed. R. Crim. P. 12(b)(2); *see also Class v. United States*, 138 S.Ct. 798, 803–04 (2018) ("[A] plea of

---

[2] Defendants' Reply argues that the record contradicts the Government's statement that Mr. Tochon identified himself as the master of the vessel [D.E. 82 at 2 n.1], and cites in support Exhibit 1, D.E. 71-1, the translator's report of the event. But section I.B., "Narrative," on page 2 states: "Brayon Tochon claimed to be the master but made no claim of nationality for the vessel." [D.E. 71-1 at 2] (formatted to sentence case).

guilty to a charge does not waive a claim that—judged on its face—the charge is one which the State may not constitutionally prosecute.") (quoting *Menna v. New York*, 423 U.S. 61, 63 & n.2 (1975)).

An indictment "may be dismissed where there is an infirmity of law in the prosecution; a court may not dismiss an indictment, however, on a determination of facts that should have been developed at trial." *United States v. Torkington*, 812 F.2d 1347, 1354 (11th Cir. 1987).  Further, "[t]he sufficiency of a criminal indictment is determined from its face." *United States v. Critzer*, 951 F.2d 306, 307 (11th Cir. 1992). The indictment's allegations are assumed to be true and are viewed in the light most favorable to the government.  *See Torkington*, 812 F.2d at 1354.

### B.   *The MDLEA*

The Constitution grants Congress the power "[t]o define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations." U.S. Const. art. I, § 8, cl. 10.  "As interpreted by the Supreme Court, this clause contains three distinct grants of power: (1) the power to define and punish piracies (the Piracies Clause); (2) the power to define and punish felonies committed on the high seas (the Felonies Clause); and (3) the power to define and punish offenses against the law of nations, (the Offences Clause)."  *See United States v. Macias*, 654 F. App'x 458, 460 (11th Cir. 2016) (quotation marks and citation omitted).[3]

Pursuant to this authority, and in recognition of the fact that "trafficking in controlled substances abord vessels is a serious international problem, . . . [that]

---

[3] This case involves Congress' power under the Felonies Clause.

presents a specific threat to the security and societal well-being of the United States[,]" Congress enacted the MDLEA in 1986. *See* 46 U.S.C. § 70501. MDLEA makes it a federal crime for a person "on board a covered vessel . . . [to] knowingly or intentionally manufacture or distribute, or possess with intent to manufacture or distribute, a controlled substance." *See* 46 U.S.C. § 70503(a). A "covered vessel" is one that, among other things, is "subject to the jurisdiction of the United States." *See* 46 U.S.C. § 70503(e)(1). In turn, the MDLEA deems a vessel subject to the jurisdiction of the United States if the master of the vessel makes a claim of nationality but the claimed nation of registry "does not affirmatively and unequivocally assert that the vessel is of its nationality." *See* 46 U.S.C. § 70502(c)(1)(A), (d)(1)(C). Accordingly, if the authorities of a claimed nation of registry are unable to corroborate a master's claim of nationality, the MDLEA deems that vessel stateless, properly allowing for the prosecution under U.S. law of any person aboard the vessel. *See, e.g., United States v. Estupinan*, 453 F.3d 1336, 1339 (11th Cir. 2006) ("[i]nasmuch as the trafficking of narcotics is condemned universally by law-abiding nations, we see no reason to conclude that it is 'fundamentally unfair' for Congress to provide for the punishment of persons apprehended with narcotics on the high seas.") (quoting *United States v. Martinez–Hidalgo,* 993 F.2d 1052, 1056 (3d Cir. 1993)).

C. ___The United Nations Convention on the Law of the Sea
("UNCLOS")___

UNCLOS, having entered into force on November 16, 1944, sets out the

parameters for the territorial waters, contiguous zone, and exclusive economic zone

("EEZ") discussed extensively in the parties' briefing.  *See* United Nations Convention

on the Law of the Sea, *opened for signature* Dec. 10, 1982, 1833 U.N.T.S. 397 (entered

into force Nov. 16, 1994).  As such, a primer on the pertinent articles may prove

useful.

The first zone, closest to a coastal State's sovereign land, is that of the

territorial sea:

> The sovereignty of a coastal State extends, beyond its land territory and
> internal waters and, in the case of an archipelagic State, its archipelagic
> waters to an adjacent belt of sea, described as the territorial sea.

1833 U.N.T.S. 397, art. 2.  While a State's territorial sea may theoretically be less

than twelve nautical miles, "[e]very State has the right to establish the breadth of its

territorial sea up to a limit not exceeding 12 nautical miles, measured from baselines

determined in accordance with this Convention." *Id.*, art. 3.[4]

The second zone—and that most at-issue here, per Defendants' briefing—is

that of the contiguous zone:

---

[4] The baselines referenced are further described in UNCLOS and allow for a combination of methods to determine such set points for calculating the twelve-nautical mile territorial sea. *See, e.g.*, *id.*, arts. 14 (allowing for a combination of methods); 12 (including in the territorial sea "[r]oadsteads which are normally used for the loading, unloading, and anchoring of ships"); 13 (declining to extend a territorial sea "of its own" to "a low-tide elevation[] wholly situated at a distance exceeding the breadth of the territorial sea").

1.      In a zone contiguous to its territorial sea, described as the contiguous zone, the coastal State may exercise the control necessary to:

    a.      prevent infringement of its customs, fiscal, immigration or sanitary laws and regulations within its territory or territorial sea;

    b.      punish infringement of the above laws and regulations committed within its territory or territorial sea.

2.      The contiguous zone may not extend beyond 24 nautical miles from the baselines from which the breadth of the territorial sea is measured.

*Id.*, art. 33.

Finally, the third zone, the EEZ, is a 200-nautical mile span:

The exclusive economic zone is an area beyond and adjacent to the territorial sea, subject to the specific legal r[e]gime established in this Part, under which the rights and jurisdiction of the coastal State and the rights and freedom of other States are governed by the relevant provisions of this Convention.

*Id.*, art 55.  Like the contiguous zone, the coastal State has specific rights in its EEZ:

(a)      sovereign rights for the purpose of exploring and exploiting, conserving and managing the natural resources, whether living or non-living, of the waters superjacent to the sea-bed and of the sea-bed and its subsoil, and with regard to other activities for the economic exploitation and exploration of the zone, such as the production of energy from the water, currents and winds;

(b)      jurisdiction as provided for in the relevant provisions of this Convention with regard to:

    (i)      the establishment and use of artificial islands, installations and structures;

    (ii)      marine scientific research;

    (iii)      the protection and preservation of the marine environment;

(c)      other rights and duties provided for in this Convention.

*Id.*, art. 56.  And, also like the contiguous zone, the EEZ has an outward limiter: "The exclusive economic zone shall not extend beyond 200 nautical miles from the baselines from which the breadth of the territorial sea is measured."  *Id.*, art. 57.

In any event, by the definitions of the EEZ and the contiguous zone—both being measured "from the baselines from which the breadth of the territorial sea is measured"—the EEZ inherently encompasses the contiguous zone.  *See id.*, arts. 33, 57.  *Compare id.*, art. 55 (the EEZ "is an area beyond *and adjacent to the territorial sea*) (emphasis added) *with id.*, art 33 ("[A] zone *contiguous to its territorial sea*, described as the contiguous zone[.]") (emphasis added).

Thus, each section—from territorial sea to EEZ—is essentially a step down in exclusivity of control and rights, with the outer limit of a nation's sovereignty at a maximum of 200 miles from the baseline (e.g., the low-water shoreline, as in Article 5).  *Id.* art. 2, 33, 56.  A nation's territorial sea ends at twelve nautical miles from the applied baseline, with the contiguous zone picking up for another twelve nautical miles beyond the territorial sea until it ends at a maximum of twenty-four nautical miles from the applied baseline.  The EEZ runs concurrently with the contiguous zone up until that twenty-four nautical mile boundary line and then on its own to the point of 200 nautical miles from the applied baseline (e.g., 200 miles from the low-water shoreline).

## III.   ANALYSIS

Defendants' motion advances three arguments in support of dismissal.  First, Defendants argue that the MDLEA is unconstitutional as applied because "the

contiguous zone is not part of the high seas within the meaning of the Felonies Clause." [D.E. 71 at 7]. Second, Defendants argue that sections 70502(c)(1)(A) and 70503(b) are void for vagueness either facially or as applied, relative to the contiguous zone. [D.E. 71 at 12]. Finally, Defendants argue that the United States' exercise of jurisdiction over them violates due process because the offenses bear no nexus to the United States. [D.E. 71 at 17].[5]

### A.  *The MDLEA is constitutional as applied to the alleged offense here*

Defendants argue that the MDLEA is unconstitutional as applied because the alleged offense occurred within the contiguous zone off the coast of Venezuela, and not on "the high seas." [D.E. 71 at 6]. As Defendants note, by the plain text of the Felonies Clause and further jurisprudence, the MDLEA's purpose is "to define and punish felonies committed on the high seas." U.S. CONST., art. I, sec. 8, cl. 10; [D.E. 71 at 6]; *see United States v. Bellaizac-Hurtado*, 700 F.3d 1245, 1248 (11th Cir. 2012). Its scope is thus, as stated, *the high seas*. For the reasons below, Defendants' contention that "the contiguous zone is not part of the high seas" "even if the broader EEZ is part of the high seas" [D.E. 71 at 7], is incorrect both by the very text of the UNCLOS articles establishing these regions and the law interpreting them.

---

[5] Defendants briefly note in their Reply that this claim is "maintained for purposes for further review by the Eleventh Circuit" and thus discuss it only in their initial motion. [D.E. 82 at 1]. We only discuss this argument here, as it is well-settled law in this Circuit that "the Due Process Clause of the Fifth Amendment does not prohibit the trial and conviction of an alien captured on the high seas while drug trafficking, because the Act provides clear notice that all nations prohibit and condemn drug trafficking aboard stateless vessels on the high seas." *United States v. Campbell*, 743 F.3d 802, 812 (11th Cir. 2014) (citing *United States v. Rendon*, 354 F.3d 1320, 1326 (11th Cir. 2003)). Thus, Defendants' argument fails.

*First*, the articles establishing both the contiguous zone and the EEZ make clear that the EEZ encompasses the contiguous zone. The contiguous zone is "a zone contiguous to [Venezuela's] territorial sea." 1833 U.N.T.S. 397, art. 33. The EEZ is, then, a seaward stretch "beyond and adjacent to [Venezuela's] territorial sea." *Id.*, art. 55. Being both "*contiguous* to" or "beyond and *adjacent* to" the twelve nautical mile territorial sea off Venezuela's coast, it is inescapable that the EEZ contains the contiguous zone. The articles make plain that both the contiguous zone and the EEZ pick up at the same point—where the twelve nautical mile territorial sea ends—and run concurrently until the twenty-four nautical mile point (from the applied baseline). *Id.*, arts. 33, 55. So, by pure logic alone, a concession (even if nonetheless later argued for the purposes of appeal) that "the Eleventh Circuit issued a key decision holding that the 200-nm EEZ of another nation *is* in fact part of the 'high Seas,' for purposes of the Felonies Clause" vitiates Defendants' argument that the contiguous zone is somehow not part of the high seas. [D.E. 71 at 6] (citing *United States v. Alfonso*, 104 F.4th 815, 821 (2024)). If the EEZ—which must, by definition, encompass the same distance from shore as the contiguous zone until the twenty-four nautical mile point—is part of the high seas, the contiguous zone cannot possibly be extricated from that.

*Second*, and as alluded to by Defendants' citation to *Alfonso*, Defendants' argument that the contiguous zone is somehow not a part of the high seas is also incorrect on the law. For instance, in a decision published during the briefing period for this motion, *United States v. Canario-Vilomar*, 128 F.4th 1374, 1382 (11th Cir.

2025), the Court of Appeals bolstered its decision in *Alfonso* by rejecting the argument "that Congress could not reach [the defendant] merely because he chose to traffic drugs in Colombia's EEZ rather than farther out into the open ocean."  In doing so, the opinion also explores the bounds of the EEZ: "The EEZ, a term of relatively modern vintage 'sits just beyond a nation's territorial waters but within 200 miles of the coastal baseline.' . . . In other words, '[n]othing about the modern EEZ as defined by customary international law disturbs in any way the Founding era concept of the term "high seas" that informed the original meaning of the Felonies Clause.'"  *Id.* (citing *Alfonso*, 104 F.4th at 821, 823).  The decision further cites a litany of cases, from this Circuit and beyond, discussing the boundary of the high seas:

> In *United States v. McPhee*, for example, we directly examined "whether, at the time of seizure, the [vessel] was a stateless vessel located within international waters."  336 F.3d 1269, 1273 (11th Cir. 2003).  And, we held, because the vessel was beyond the "twelve-mile … territorial boundary" of Bahamian territorial waters, the vessel was "located within international waters" and thus subject to MDLEA jurisdiction.  *Id.* at 1273, 1276.  *See also United States v. Louisiana*, 394 U.S. 11, 23, 89 S. Ct. 773, 22 L. Ed.2d 44 (1969) *("Outside the territorial sea are the high seas, which are international waters not subject to the dominion of any single nation.");* Marino-Garcia, 679 F.2d at 1379 n.8 (the high seas "include all waters beyond the territorial seas of the United States and beyond the territorial seas of any foreign nation"); *United States v. Beyle*, 782 F.3d 159, 167 (4th Cir. 2015) ("The question then becomes where exactly [a nation's] territorial sea ends and the high seas begin.  The weight of authority points to an outer territorial limit of twelve nautical miles[.]"); *United States v. Dire*, 680 F.3d 446, 460 n.11 (4th Cir. 2012) (noting "the twelve-mile boundary set by international law today" that "demarcat[es] a nation's territorial waters from the high seas").

*Canario-Vilomar*, 128 F.4th at 1382 (alterations in original, emphasis added).  Thus, if the EEZ off the coast of Venezuela—which picks up where Venezuela's territorial sea ends and is part of the high seas—overlaps with the contiguous zone (which also

picks up where Venezuela's territorial sea ends), it must be that the contiguous zone is, too, part of the high seas. Following the line of precedent, the demarcation line is that of the end of Venezuela's territorial sea, *see id.* (collecting cases)—*not* one between two overlapping zones beyond its limits. The contiguous zone would then be, as is the EEZ, within the reach of the Felonies Clause. *See Alfonso*, 104 F.4th at 821.

**B.** ***The MDLEA's extraterritoriality and jurisdictional provisions are not void for vagueness—either on their face or as applied***

Defendants raise a Fifth Amendment argument to the MDLEA's extraterritoriality provision, 46 U.S.C. § 70503(b), which "applies [the act's provisions] even through the act is committed outside the territorial jurisdiction of the United States." The Due Process Clause of the Fifth Amendment, as relevant here, provides that, "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law[.]" U.S. CONST. amend. V. According to Defendants, that the MDLEA gives United States jurisdiction in another coastal State's contiguous zone creates an edict so vague, whether on its face or as applied, that it is "'standardless,'" such that "'it invites arbitrary enforcement'" and thus violates the Due Process Clause. [D.E. 71 at 13] (citing *Johnson v. United States*, 576 U.S. 591, 595 (2015)).

We note at the outset that Defendants' arguments are inherently flawed, both by the text of the statutes they lean on and the case law. As established in section II.A., the contiguous zone and the EEZ overlap. So, Defendant's emphasis on the contiguous zone as the boogeyman of their Fifth Amendment argument is already

misplaced as a matter of the very text of the UNCLOS articles that define these regions.   Furthermore, Defendants' many statements as to the be-all-end-all sovereignty of a coastal State in their contiguous zone—and therefore the theoretical effect that the MDLEA's enforcement would have—are not well taken.

Defendants continue here to trot out a parade of horribles about the contiguous zone—where a "coastal nation unquestionably has a recognized right to assert jurisdiction and enforce its own domestic laws."  [D.E. 71 at 14] (going on to criticize the "relative *standardlessness* in the MDLEA as to how U.S. authorities are to navigate a similar conflict involving, for instance, Venezuelan authorities legitimately enforcing Venezuelan law in Venezuela's contiguous zone") (emphasis in original).  And it is true—Venezuela has certain control rights in its contiguous zone, as would any coastal State.[6]  1833 U.N.T.S. 397, art. 33.  But they are not unfettered.  *Id.*  And the distinction is an important predicate to Defendants' Fifth Amendment challenge.

Article 33 of UNCLOS is clear as to a costal State's control rights in its contiguous zone:

> 1.    In a zone contiguous to its territorial sea, described as the contiguous zone, the coastal State may exercise the control necessary to:
>> a.    *prevent infringement of its customs, fiscal, immigration or sanitary laws and regulations within its territory or territorial sea;*
>> b.    *punish infringement of the above laws and regulations committed within its territory or territorial sea.*

---

[6] This is also true in a coastal State's EEZ, where they have, e.g., "sovereign rights for the purpose of exploring and exploiting, conserving and managing the natural resources," including "the protection and preservation of the marine environment." 1833 U.N.T.S. 397, art. 56.

> 2.   The contiguous zone may not extend beyond 24 nautical miles from the baselines from which the breadth of the territorial sea is measured.

*Id.* (emphasis added).  In other words, under this provision, a coastal State can exert control sufficient to prevent or punish infringement of "its customs, fiscal, immigration or sanitary laws and regulations *within its territory or territorial sea*." *Id.* (emphasis added).  So, (1) the subset of laws and regulations regarding which the coastal State can exert control is well-defined; and (2) those infringements must be ones within its territory or territorial sea.

UNCLOS provides context to define a coastal State's territory: "The sovereignty of a coastal state extends, beyond its land territory and internal waters and, in the case of an archipelagic State, its archipelagic waters, to an adjacent belt of sea, described as the territorial sea."  *Id.*, art. 2.  This is consistent with the case law in our Circuit and beyond, interpreting the territorial bounds of coastal States relative to the high seas.  *See, e.g.*, *United States v. Louisiana*, 394 U.S. 11, 23 (1969) ("Outside the territorial sea are the high seas, which are international waters not subject to the dominion of any single nation."); *Marino-Garcia*, 679 F.2d at 1379 n.8 (the high seas "include all waters beyond the territorial seas of the United States and beyond the territorial seas of any foreign nation").  In other words, a coastal State's exertion of control within its contiguous zone is not only limited to a subset of possible infringements (customs, fiscal, immigration, or sanitary laws), but also to the prevention or punishment of infringements of that subset of laws *within its territory*. I.e., the prevention or punishment must be relative to some infringement within the coastal State's land territory or territorial sea—*not* within the contiguous zone (or,

for that matter, the EEZ) alone.  So, the contiguous zone itself is not the font of abject "standardlessness" Defendants claim it to be.  [D.E. 71 at 15].  And, thus, the premise of Defendant's argument that law enforcement is without standards "where a coastal nation unquestionably has a recognized right to assert jurisdiction and enforce its own domestic laws," full stop, is inherently flawed; a vessel "like the one in this case" is not, in fact, "*without question* subject to Venezuelan law and jurisdiction in [its] contiguous zone."  [D.E. 71 at 14] (emphasis added).[7]

The text of the UNCLOS articles thus give further credence to the existing precedent in this Circuit:  that the EEZ—and by necessity, the contiguous zone—is the high seas; that it is an area of lesser sovereignty than in a coastal State's defined territory (and thus not the same); and that it thus falls within the reach of the Felonies Clause.  *See supra* II.A.  These statutory distinctions from Defendants' framing of the contiguous zone, then, bear heavily on their Fifth Amendment claims, because there is a long line of jurisprudence supporting the constitutionality of not just the MDLEA, but also its similar predecessor statutes. And though Defendants contend that "[w]hile the Eleventh Circuit has previously addressed vagueness challenges to the MDLEA and its predecessor statutes, none addressed the issue presented here" [D.E. 71 at 16], that is not entirely true.

---

[7] Defendants' Reply seeks to further gild their argument in stating that, "the United States recognizes that Venezuela has the *absolute authority* to enforce its own criminal laws as to vessels in its own contiguous zone," and that those committing offenses in the contiguous zone are "essentially committing crimes *in* Venezuela." [D.E. 82 at 6–7]. (emphasis added).  This is not the case.

15

Two cases in particular—one of which Defendants cite—address alleged vagueness in the predecessor statutes to the MDLEA. *United States v. Mena* analyzes a void for vagueness challenge to the phrase "'vessel subject to the jurisdiction of the United States,'" in the a predecessor statute to the MDLEA, 46 U.S.C. App. § 1903. 863 F.2d 1522, 1527 (11th Cir. 1989). In doing so, the decision likens the examination to that in *United States v. Gonzalez*, 776 F.2d 931, 934 (11th Cir. 1985), which in turn considers a vagueness challenge to the predecessor statute to section 1903, the Marijuana on the High Seas Act of 1980, 21 U.S.C. §§ 955a–955d. The *Gonzalez* opinion concludes, quite broadly:

> **There is nothing vague about the statute.  Congress has provided clear notice of what conduct is forbidden**: any possession of marijuana on the high seas with intent to distribute.  The United States will enforce this law to the full extent of its ability under international law.  Congress has afforded a legislative grace to our fellow nations by conditioning enforcement of the law upon their consent.  This grace, however, does not create a notice problem.  Both the offense and the intent of the United States are clear.  Those embarking on voyages with holds laten with illicit narcotics, conduct which is contrary to laws of all reasonably developed legal systems, do so with the awareness of the risk that their government may consent to enforcement of the United States' laws against the vessel.  Due process does not require that a person who violates the law of all reasonable nations be excused on the basis that his own nation *might* have requested that he not be prosecuted by a foreign sovereign.

*Id.* at 940–41 (bolded emphasis added, italicized emphasis in original).

Following this reasoning, *Mena* "[s]imilarly[] find[s] nothing unduly vague," in the definition of a vessel subject to United States jurisdiction in section 1903. 863 F.2d at 1527. In context and as later relevant here, section 1903 contemplated "vessel[s] subject to the jurisdiction of the United States" in the context of the

"[m]anufacture, distribution, or possession with intent to manufacture or distribute controlled substances on board vessels"—including "vessel[s] without nationality." 46 U.S.C. App. § 1903. The MDLEA is nearly identical, if not identical, in its phraseology.[8] *See* 46 U.S.C. §§ 70502–70503.

So, looking at the history of the predecessor acts to the MDLEA and understanding the context, *Gonzalez*'s analysis of a similar, predecessor statute is particularly relevant here: the Eleventh Circuit has, in fact, "considered and rejected an argument asserting the vagueness of the predecessor of section 1903" and, by extension, the MDLEA. *Mena*, 863 F.2d at 1527. And in doing so, *Gonzalez* highlights the critical element of the now-MDLEA's application—and, thus, the constitutionality of its extraterritorial jurisdiction (and, what that entails for law enforcement): that it applies to conduct *on the high seas*.

In enacting the MDLEA, Congress "f[ou]nd and declare[d] that[] trafficking in controlled substances aboard vessels is a serious international problem, is universally condemned, and presents a specific threat to the security and societal well-being of the United States[.]" 46 U.S.C. § 70501. Because of this, "'*[t]he MDLEA was specifically enacted to punish drug trafficking on the high seas*.'" *Estupinan*, 453 F.3d at 1338 (citing *United States v. Rendon*, 354 F.3d 1320, 1325 n.2 (11th Cir. 2003)) (emphasis added). As analyzed above, this was very recently reaffirmed in *Canario-*

---

[8] Defendants' Fifth Amendment argument also challenges the constitutionality of 46 U.S.C. section 70502(c)(1)(A), which includes "a vessel without nationality" as a "vessel subject to the jurisdiction of the United States." [D.E. 71 at 12]. As applied, the transcript Defendants included with their motion indicates that there was, in fact, no claim of nationality. [D.E. 71-1 at 2].

*Vilomar*: "[U]niversal protective principles support [the MDLEA's] extraterritorial reach." 128 F.4th at 1383 (citing *United States v. Campbell*, 743 F.3d 802, 810 (11th Cir. 2014)). Thus, "'nothing about the modern EEZ [and, by extension, the contiguous zone that overlaps with the EEZ for the twelve nautical miles it runs off the territorial sea,] as defined by customary international law disturbs in any way the Founding era concept of the term 'high seas' that informed the original meaning of the Felonies Clause.'" *Id.* (internal alteration omitted) (citing *Alfonso*, 104 F.4th at 823).

Accordingly Defendants' Fifth Amendment challenge to the MDLEA fails for the same reason as their first argument—a point they even make: "the MDLEA is only constitutional when applied to conduct ***on the high seas***." [D.E. 71 at 6] (emphasis in original). Accordingly, we must analyze Defendants' Fifth Amendment challenges to the MDLEA's applicability on the high seas—on its face and as applied—as has been assessed many times before in this Circuit.

First, "[a] facial challenge . . . is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstance exists under which the Act would be valid." *Id.* at 745. Outside of the First Amendment context (as is the case here), a showing that the act "'might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid.'" *Mena*, 863 F.2d at 1527 (citing *Salerno*, 481 U.S. at 745). As in *Mena*, "the [D]efendants have simply failed to even suggest 'that no set of circumstance exists under which the Act would be valid.'" *Id.* (citing *Salerno*, 481 U.S. at 745).

18

In their briefing, Defendants proffer many questions as to what situations law enforcement might encounter, [D.E. 71 at 15], but make no genuine showing that the MDLEA is at all times and under all circumstances unconstitutional on its face when applied on the high seas—as it would be in the contiguous zone.  Nor could they, for the myriad reasons above.  Thus, Defendants' facial attack fails.

Second, Defendants' as applied challenge also fails.  Case law past and present upholds the constitutionality of the MDLEA's extraterritorial jurisdiction (and that of its predecessor statutes) on the high seas.  *See, e.g.*, *Gonzalez*, 776 F.2d at 940–41; *Alfonso*, 104 F.4th at 823; *Canario-Vilomar*, 128 F.4th at 1383.  Applying *Gonzalez* here: "There is nothing vague about the statute."  776 F.2d at 940.  Nor, for that matter, is there any vagueness to the scope of the Felonies Clause: "[T]o define and punish felonies committed on the high seas[.]"  U.S. CONST., art. I, sec. 8, cl. 10.  As the contiguous zone, like the EEZ, is the high seas, and the MDLEA is clear as to the conduct it prohibits and that it is limited to the high seas, vagueness is not an obstacle to application of the statute in this case.

Accordingly, we find that jurisdiction was properly exercised under the MDLEA because Defendants were interdicted on the high seas and, as such, their motion to dismiss should be **DENIED**.

### IV.    CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that Defendants' joint motion to dismiss the Government's indictment [D.E. 71] should be **DENIED**.

Pursuant to Local Magistrate Rule 4(b) and Fed. R. Civ. P. 73, the parties have fourteen (14) days from service of this Report and Recommendation within which to file written objections, if any, to the District Judge. Failure to timely file objections shall bar the parties from *de novo* determination by the District Judge of any factual or legal issue covered in the Report *and* shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected-to factual or legal conclusions included in the Report. 28 U.S.C. §636(b)(1); 11th Cir. R. 3-1; *see, e.g.*, *Patton v. Rowell*, 678 F. App'x 898 (11th Cir. 2017); *Cooley v. Comm'r of Soc. Sec.*, 671 F. App'x 767 (11th Cir. 2016).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, this 4th day of April, 2025.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge